UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| ANNETTE OAKLEY | : | |
| Debtor | : | Bankruptcy No. 12-18456bf |

_____

| | | |
|---|---|---|
| NUNZIO CARTO, JR. | : | |
| Plaintiff | : | |
| v. | : | |
| ANNETTE OAKLEY, JOHN DOE 1-100, AND ABC COMPANY 1-100[1] | : | |
| Defendants | : | Adversary No. 13-0053 |

_____

.................................................

MEMORANDUM

.................................................

Before me is the complaint of Nunzio Carto, Jr. seeking to deny a chapter 7

discharge to the debtor/defendant, Annette Oakley, pursuant to 11 U.S.C. § 727(a)(4),[2]

_____

[1]Despite the caption of this adversary proceeding, the plaintiff seeks relief only against the debtor.

[2]The plaintiff's complaint refers 11 U.S.C. § 727(c)(2), which provides that "the court may order the trustee to examine the acts and conduct of the debtor to determine whether a ground exists for denial of discharge."  In his post-trial submission, the plaintiff refers to section 727(c)(1)—affording any creditor standing to object to discharge—as well as cites to section 727(a)(1)-(5).  Plaintiff's "Legal Brief" at 17 (unpaginated).
    From the specific  allegations in the complaint, the evidence elicited at trial, and the arguments made in the plaintiff's posttrial memorandum, it appears that the plaintiff is seeking denial of discharge based upon 11 U.S.C. § 727(a)(4), i.e., that the "debtor knowingly and fraudulently, in or in connection with the case–(A) made a false oath or account[.]"  See Plaintiff's "Legal Brief" at 17-18 (unpaginated).

and/or to hold the debtor/defendant's debt to him nondischargeable under 11 U.S.C. §

523(a)(2) for fraud.[3]  The debtor opposes all relief.  Upon consideration of the evidence

adduced at a one-day trial, at which Ms. Oakley, Mr. Carto, and Mr. Carto's son-in-law

testified, along with various documents that were admitted, plus consideration of the

parties' post-trial memoranda,[4] these two issues are ripe for determination.


## I.


The following are my findings of fact based upon the evidence presented,

including trial exhibits and those documents of which the parties requested that I take

judicial notice.[5]

1. In or about March 2011, Ms. Oakley sought to borrow $65,000 from Mr.

Carto.  N.T. at 52.

---

[3]The plaintiff also contends that the debtor's case should be dismissed pursuant to section 707(a) as filed in bad faith.  As this was raised for the first time in the plaintiff's post-trial memorandum, at 18-19 (unpaginated) it is not properly before me.

[4]The parties sought a lengthy delay for the submission of their post-trial memoranda, in part to obtain a copy of the trial transcript, and in part because of defendant's counsel's trial schedule.  N.T. 204-06.  That request was granted.

In reviewing these submissions, I note that the defendant's memorandum attached a slight modification of exhibit P-1.  In general,  documents simply attached to post-trial submissions but never offered in evidence cannot be considered, as the opposing party will have had no opportunity to challenge their authenticity or admissibility, cross-examine witnesses regarding those documents, or offer rebuttal evidence.  See, e.g., In re Millman, 2003 WL 716289, at *3 n.12 (Bankr. E.D. Pa. Feb. 3, 2003); In re MacDonald, 222 B.R. 69, 72 (Bankr. E.D. Pa. 1998); In re Midway Airlines, Inc., 221 B.R. 411, 462-63 (Bankr. N.D. Ill. 1998); Matter of Holly's, Inc., 190 B.R. 297, 301 (Bankr. W.D. Mich. 1995).  In this instance, however, the defendant numbered the paragraphs of exhibit P-1 that she considered material.  I shall discuss exhibit P-1 without reference to the defendant's numbering scheme.

[5]Reference to the transcript of the August 8, 2013 trial will be denoted "N.T. at."

2. At the time this loan was sought, Mr. Carto was a funeral home director. N.T. at 141.  Ms. Oakley was a practicing attorney, specializing in plaintiffs civil rights litigation, but also engaging in general civil and real estate matters.  N.T. at 54.  She was admitted in the state and federal courts of New Jersey and Pennsylvania, but at the time of trial her Pennsylvania license had lapsed owing to unpaid fees.  N.T. at 93-94.  Ms. Oakley now subsists off partial disability payments.  N.T. at 93.

3. In March 2011, Ms. Oakley owned a one-third interest in real estate located at 6984 Weatham Street, Philadelphia, Pennsylvania, held as a tenant in common with her mother and aunt.  Ex. P-1, at p.1; N.T. at 109.

4. Ms. Oakley approached Mr. Carto seeking to sell to him her partial interest in real estate for $65,000.  N.T. at 106, 112-113.  When Mr. Carto informed her that he had no interest in buying her interest, see N.T. at 114, she requested a loan of $65,000 so that she could purchase a 2007 M6 BMW automobile.  N.T. at 140, 155.

5. The two knew each other as Ms. Oakley was a friend of Mr. Carto's then-wife.[6]  N.T. at 51, 145, 153-54.  Ms. Oakley also had filed some collection lawsuits on behalf of Mr. Carto's funeral home business.  N.T. at 95.

6. Given Ms. Oakley's friendship with his wife, and as his wife did not oppose such a request, Mr. Carto agreed to loan Ms. Oakley $65,000.  N.T. at 146, 155, 157.

7 . On March 2, 2011, Mr. Carto gave Ms. Oakley a check for $30,000, and on March 4, 2011, he gave her a check for $35,000.  N.T. at 119, 165-66, 169, 174.

---

[6]The couple were separated at the time and later divorced.  N.T. at 173-74.

8. Between the receipt of the two checks, Ms. Oakley drafted a promissory note, ex. P-1, that she presented to Mr. Carto on March 3, 2011.  N.T. at 8, 76.

9. This promissory note, dated March 2, 2011 but signed by Ms. Oakley and notarized on March 3, 2011, stated that the principal amount of the loan was $80,000. Ex. P-1, at 1.  Repayment of this amount "shall be made from the borrower's portion of ANY and ALL sale proceeds" of the Weatham Street realty, ex. P-1 (emphasis in the original), based upon Ms. Oakley's belief in the value of the realty. Ex. P-1; N.T. at 76, 78, 147-48.

10. Ms. Oakley promised to "pursue, in good faith, on the Lender's behalf  . . . the immediate sale of" the Weatham Street property "so that such sale should take place within twelve (12) Months of the date of this instrument."  Ex. P-1, p. 1.  Any amount Ms. Oakley netted from the sale of her one-third interest above $80,000 would also be paid to Mr. Carto, while any deficiency would be paid by Ms. Oakley within six months of the property sale.  Id.

11. In addition, Ms. Oakley promised:

> Borrower agrees that until the principal owed under this promissory note are paid in full from the sale of property known as 6984 Weatham Street, Philadelphia, Pennsylvania 19119, this note will be secured by the Borrower's 2007 M6 BMW.

> Borrower agrees not to encumber property known as 6984 Weatham Street, Philadelphia, Pennsylvania 19119 or encumber or sell the Borrower's 2007 M6 BMW until payment to Lender is satisfied in full.

Id.; see also N.T. at 37 (acknowledging that her promissory note stated that she would not to sell the BMW until Mr. Carto was paid in full).

4

12. Ms. Oakley also promised that if she should die in an accident involving the BMW, "in which the vehicle is totaled or damaged" then all insurance proceeds would be paid to the lender, Mr. Carto.  Id.

13. Finally, the promissory note included the following provision:

> If Borrower's 2007 M6 BMW shall become destroyed in any manner which cause[s] the accelerated decrease in the value of such vehicle, Borrower shall immediately execute a Quit Claim Deed transferring all of her interest in property known as 6984 Weatham Street, Philadelphia, Pennsylvania 19119 to Lender.  Borrower agrees to remain obligated to pursue the sale of said property in good faith and by any relevant and legal means available so as to cause the sale of such property within twelve (12) months from the date of this instrument.

Ex. P-1, p. 2.

14. Mr. Carto explained that he previously had loaned or given money to family and friends.  N.T. at 156, 168.  In so doing, he would occasionally request that the borrower acknowledge the debt.  N.T. at 156.  His $65,000 loan to Ms. Oakley was the largest loan he had ever made.  N.T. at 156.

15. Mr. Carto requested that Ms. Oakley prepare a promissory note in connection with her loan request.  N.T. at 143.  The only term that he asked her to include in the note was that the $65,000 loan mature in one year.  Id.  Thus, terms of the promissory note stating that the principal amount was $80,000, the BMW vehicle served as collateral, and repayment would be made from the proceeds of the sale of the Weatham Street property were included voluntarily by Ms. Oakley.

16. Although Mr. Carto testified that a promissory note signed by Ms. Oakley was a condition for the loan, N.T. at 143, he nonetheless provided Ms. Oakley with a $30,000 check before receiving the note.  Moreover, I find credible the testimony

5

of Ms. Oakley that upon his receipt of the note Mr. Carto did not immediately read it.
N.T. at 117-118.

17.   On March 4, 2011, Mr. Carto tendered a check to Ms. Oakley for
$35,000.  Ms. Oakley believes that this second check may have been made payable to the
dealership selling the automobile, N.T. at 120, while Mr. Carto's son-in-law and longtime
employee, James Guercio, more credibly testified that both checks were made payable to
Ms. Oakley.  N.T. at 165-66, 174.

18.  Mr. Guercio learned about the loan to Ms. Oakley  a week after these
checks were issued, N.T. at 171, and questioned Mr. Carto about them, who told him that
the purpose of the loan was to enable Ms. Oakley to buy an automobile.  N.T. at 170.

19. Mr. Guercio then obtained a copy of the promissory note, read it, N.T. at
170, and put it away for safekeeping.  N.T. at 175.

20. In December 2011, Mr. Carto, then approximately 83 years old, turned
over his funeral business to Mr. Guercio to operate and granted him a power of attorney
to oversee Mr. Carto's signing of checks.  N.T. at 164, 169.

21. At trial, Mr. Guercio stated that Mr. Carto's "memory is not what it
used to be."  N.T. at 169; see also N.T. at 159 (Mr. Carto: "my mind is not entirely
here.").

22. After she received the loan from Mr. Carto, Ms. Oakley purchased a
2007 BMW M6 for $52,000.  N.T. at 122.  This was the fourth BMW vehicle she had
owned.  N.T. at 121.  Ms. Oakley did not explain how she spent the remaining $13,000 of
loan proceeds.

6

23. In July 2011, just a few months after its purchase, Ms. Oakley sold the BMW M6 for $38,000 to webuyanycar.com.  See ex. P-3 (Amended Statement of Financial Affairs, at #10).

24.  Ms. Oakley testified that she sold the M6 vehicle because the automobile had been vandalized with key scratches and repeatedly had "grill markers off the side of the car" stolen.  N.T. at 16, 68, 138.  Ms. Oakley replaced the grill markers prior to selling the car.  N.T. at 138.

25. Ms. Oakley then used the sale proceeds to purchase a 2009 BMW for $32,000 from another dealership.  N.T. at 69.

26. She paid expenses with the $6,000 difference.  N.T. at 69.

27. In December 2011, Ms. Oakley sold the 2009 BMW to webuyanycar.com for $16,000.  See ex. P-3 (Amended Statement of Financial Affairs, at #10).  She did not explain why this second vehicle was sold, nor how she used the sale proceeds.

28. The parties dispute whether Ms. Oakley informed Mr. Carto that she had sold the 2007 M6 BMW.  Compare N.T. at 126 with N.T. at 140.  There is no dispute, however, that Ms. Oakley did not seek Mr. Carto's prior approval for the sale; nor did she pay over any proceeds of the vehicle, or quit claim her interest in the Weatham property to him, after the vehicle was sold.  N.T. at 17, 138, 140.

29. The Weatham property that Ms. Oakley stated would be the source of her loan repayment was inherited by her, her mother and her aunt (her mother's sister), from her grandmother, and these three then owned the real property as tenants in common.  N.T. at 52-53.

7

30. In March 2011, at the time Ms. Oakley sought her loan from Mr. Carto, she and her mother wanted to sell the Weatham property, but her aunt refused to do so. N.T. at 53, 124-25.  In addition, the aunt was not speaking with either her sister or Ms. Oakley.  N.T. at 53-54, 75.

31. Ms. Oakley hoped to sell the Weatham property through the efforts of a real estate agent.  Although she found an agent willing to sell the realty, no such agent was ever engaged as her aunt refused to sign any listing agreement.  N.T. at 53-54, 124-25.

32. At some point before the end of the summer in 2011, Ms. Oakley realized that she would need to file a partition action in order to sell the property.  N.T. at 124-25.  However, she testified that she had not realized what a partition action involved, did not have the funds to initiate this action, did not obtain funds from her mother, and did not ask Mr. Carto for financial assistance.  N.T. at 75, 129.  Thus no partition action was ever filed.  N.T. at 135-36, 138.

33. Ms. Oakley did not inform Mr. Carto that she was not bringing a partition action, nor that she believed she did not have the finances to do so.  N.T. at 128-29.

34. In March 2012, a year after the loan was made, Ms. Oakley did not repay Mr. Carto, although he made demand of her for repayment.  N.T. at 41, 130-31.

35. Mr. Carto brought suit in state court, which suit was stayed by Ms. Oakley's bankruptcy filing.  N.T. at 76-77.

36. Ms. Oakley filed a petition under chapter 13 on September 7, 2012, represented by counsel.  However, when she failed to file timely all required documents

8

even after an extension request had been granted, her case was dismissed by order dated
October 12, 2012.  <u>See</u> docket #12.[7]

37.  Ms. Oakley explained that she did not receive the notice about missing
documents because she was living in New Jersey rather than at the Philadelphia address
listed on her petition, and did not pick up her mail regularly because she did not have a
car.  N.T. at 89-90.  She also did not disclose any business address  <u>See</u> ex. P-7
(Statement of Financial Affairs, #18).[8]

38. On November 6, 2012, this court granted her motion to vacate
dismissal, as well as to convert her bankruptcy case to one under chapter 7.  <u>See</u> docket
#18.

39. On November 9, 2012, the debtor filed her required bankruptcy
schedules and statement of financial affairs.  <u>See</u> docket #21.  February 10, 2013 was set
as the last day to object to discharge or dischargeability.  <u>See</u> docket #27.

40. Ms. Oakley attributed her financial problems to an attorney who failed
to repay her fees on cases she brought to his firm and then litigated.  N.T. at 57-59.  She
estimated her unpaid fees at more than $150,000.   N.T. at 58, 189.  In June 2011, Ms.

---

[7]At the request of the defendant, agreed to by the plaintiff, I take judicial notice,
under Federal Rule of Evidence 201 (incorporated into bankruptcy cases and proceedings by
Federal Rule of Bankruptcy Procedure 9017), of the docket entries and documents attached to
those entries, such as the debtor's bankruptcy schedules.  N.T. at 184; <u>see generally</u> <u>In re Indian
Palms Associates, Ltd.,</u> 61 F.3d 197 (3d Cir. 1995).

[8]The debtor did disclose in answer to question #1 of the Statement of Financial
Affairs that she had received income from self-employment providing "legal services" in 2010-
12.  Question #18, however, requests additional information going back six years if the debtor,
<u>inter</u> <u>alia</u>, "was self-employed in a trade, profession, or other activity either full- or part-time."
To that question, the debtor answered: "None."  Ex. P-7.

Oakley suspected that her fees from two lawsuits had been or would be unpaid, and she confirmed her suspicion by November 2011.  N.T. at 59, 109.

41. Ms. Oakley was also represented by this same attorney in two malpractice lawsuits against her .  See ex. P-4.  She averred that he permitted both lawsuits to proceed to default judgment without her knowledge.  N.T. at 60-62.

42. On November 9, 2012, Ms. Oakley filed her initial Bankruptcy Schedules and Statement of Financial Affairs.  See docket entry #21.

43. On her Bankruptcy Schedule A, Ms. Oakley stated that her interest in the Weatham Street realty was worth $80,000.  She also added the following concerning her interest in this property: "One third interest in property.  Roughly $25,000.  Debtor willing to surrender.  Valuation based upon BRT."  See id.  Ms. Oakley testified her $25,000 figure was based upon the "BRT," or tax assessment value, N.T. at 78, and that the property was actually worth at least $300,000, with her interest $80,000 or more.  Ex. P-10; N.T. at 42-45, 78-79.

44.  On her initial Bankruptcy Schedule B, Ms. Oakley did not disclose her asserted claims for unpaid legal fees.  See ex. P-7.  In her initial Statement of Financial Affairs, the debtor identified four lawsuits to which she was a party within one year of her bankruptcy filing.  Included among them were the two malpractice lawsuits and Mr. Carto's state court litigation.  Ex. P-7.  On her initial Bankruptcy Schedule D, she listed one of the malpractice plaintiffs, Victoria Cimino, as holding a judgment lien on property.  Ex. P-2.

45. On her initial Statement of Financial Affairs, Ms. Oakley answered "None" to the question whether she had transferred any property out of the ordinary

course of her business or financial affairs during the two years prior to her bankruptcy

filing.  Ex. P-7.

46.  Ms. Oakley listed as having an "unknown" value a potential

malpractice claim against her attorney in connection with the default judgments entered

against her, on an Amended Bankruptcy Schedule B filed on December 10, 2012.  Ex. P-

8.  On that same Amended Schedule B, Ms. Oakley also disclosed, as an asset worth only

$25,000, those fees she maintains she was owed prepetition, stemming from a case

captioned McKenna v. City of Philadelphia, without identifying from whom these fees

would be paid.  See Ex. P-8.  Rather, she disclosed this asset as worth $25,000 because

that was the amount she stated had been awarded in November 2012.  N.T. at 81.[9]  The

fees were received by the trustee in January 2013, N.T. at 83, with a portion distributed by

the trustee to Ms. Oakley based upon her claim of exemption.  See docket entry #71

(Trustee's Final Report, at 1).  Ms. Oakley did not disclose any other case or claim for

fees owed to her.

47.  Ms. Oakley maintains that she was not aware of the Cimino judgment

when she borrowed the money from Mr. Carto and offered to transfer her interest in the

Weatham property to him, nor when she drafted the promissory note.  N.T. at 13, 28, 37,

42, 47.

48. On Bankruptcy Schedule F, Ms. Oakley disclosed $104,512 in

unsecured debts.  See ex. D-1.  Among her unsecured creditors was Daniel Ruga with a

claim scheduled in the amount of $0.  See id.

_____

[9]See McKenna v. City of Philadelphia, 2012 WL 5269218, at *4 (E.D. Pa. Oct.
25, 2012) (awarding Ms. Oakley counsel fees in the amount of $24,050 in October 2012).

49. Mr. Ruga brought a malpractice lawsuit against Ms. Oakley and others in October 2009. Ex. P-4. Ms. Oakley was aware of this lawsuit in March 2011 and when she filed her bankruptcy petition  See ex. P-7 (Statement of Financial Affairs #4); N.T. at 61.

50. A default judgment against Ms. Oakley was entered in June 2011 in the Ruga case. N.T. at 23-24, 30. Ms. Oakley stated that she was unaware of the default judgment until trial in this proceeding. N.T. at 23, 63-64.

51. Ms. Oakley testified that, prior to her bankruptcy filing, her attorney informed her regarding the Ruga lawsuit that "it was thrown out" and "being thrown out." N.T. at 63. Nonetheless, she included the Ruga litigation as having an "unknown" status in her Statement of Financial Affairs. Ex. P-7.

52. At the time of borrowing the money, Ms. Oakley did not tell Mr. Carto of either the Cimino or Ruga pending lawsuits because she believed neither had merit. N.T. at 29, 79-81.

53. Ms. Oakley testified that she gave all mail involving her two malpractice lawsuits to her attorney without reading the mail herself. N.T. 98-99. Moreover, she explained that she never checked the status of either of these lawsuits online because she trusted her attorney. N.T. at 96-97, 136.

54. On February 6, 2013—five days after Mr. Carto filed his adversary proceeding in this case—Ms. Oakley filed another amended Statement of Financial Affairs, this time disclosing the sale of the 2007 BMW in July 2011, the purchase of the 2009 BMW, and its sale in December 2011. Ex. P-3 (Question #10 on the Statement of Financial Affairs, which asks "List all other property, other than property transferred in

the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case."); see also N.T. at 16,

55. Ms. Oakley testified that she did not think she needed to disclose the vehicle transfers because they were not to family or friends within the last four years, and because her attorney never asked her about such transfers.  N.T. at 34, 66-67.  She acknowledged that the February 2013 amendment was triggered by Mr. Carto's complaint in this adversary proceeding.  N.T. at 67.

56. In December 2012, the chapter 7 trustee conducted an examination of the debtor, at which time he reported that he intended to investigate the possible existence of assets to distribute to creditors.  See docket entry dated December 13, 2012.

57. The chapter 7 trustee submitted his final report disclosing that the only assets he had recovered were the fees paid to Ms. Oakley in November 2012.  See docket entry #71.

58.  Mr. Carto did not file a proof of claim in this bankruptcy case.  See Claims Register.  He did, however, file a timely complaint objecting to discharge and seeking a determination of nondischargeability.

II.

I reach the following conclusions of law.

1. Mr. Carto proved by a preponderance of the evidence that Ms. Oakley's omissions or misstatements in her bankruptcy schedules and statement of financial affairs were made with a "reckless indifference to the truth."

2. Mr. Carto proved by a preponderance of the evidence that Ms. Oakley's omissions or misstatements were material to the administration of the bankruptcy case.

3. Ms. Oakley's chapter 7 discharge should be denied pursuant to 11 U.S.C. § 727(a)(4) for making a false oath or account, in not disclosing truthfully all of her financial information.

4. Mr. Carto did not prove that Ms. Oakley obtained money from him by false pretenses, a false representation, or actual fraud, upon which he justifiably relied to his detriment, as required by section 523(a)(2)(A).

5. Mr. Carto did not prove that Ms. Oakley used a statement in writing that was materially false, respecting her financial condition, upon which Mr. Carto reasonably relied, and with the intent to deceive him, as required by 11 U.S.C. § 523(a)(2)(B).

6. Mr. Carto's claim against Ms. Oakley should not be held nondischargeable under 11 U.S.C. § 523(a)(2).

III.


At trial, the defendant offered evidence that the plaintiff had been listed as a creditor in her bankruptcy case and had received notice of the claims bar date, but had not filed a proof of claim.  Although not asserted in her post-trial memorandum, this evidence

suggests that the defendant may not believe that the plaintiff has standing to object to her

bankruptcy discharge nor seek a determination that his claim is nondischargeable.

Questions of standing must be considered <u>sua</u> <u>sponte</u> by federal courts,

including bankruptcy courts, as they are akin to subject matter jurisdiction.  <u>See</u>, <u>e.g.</u>, <u>In</u>

<u>re Weaver</u>, 632 F.2d 461, 462 n.6 (5th Cir. 1980) (the issue of standing of a bankruptcy

trustee considered <u>sua</u> <u>sponte</u>); <u>In re Piccoli</u>, 2006 WL 3371916, at *1 n.2 (Bankr. E.D.

Pa. 2006); <u>see</u> <u>also</u> <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215, 230-31 (1990);

<u>National Ass'n for Advancement of Multijurisdiction Practice v. Gonzales</u>, 211 Fed.

Appx. 91, 94 n.3 (3d Cir. 2006) ("Neither party addresses standing in its brief, but, as

they are jurisdictional in nature, we are required to raise issues of standing <u>sua</u> <u>sponte</u> if

they exist."); <u>Addiction Specialists, Inc. v. Twp. of Hampton</u>, 411 F.3d 399, 405 (3d Cir.

2005).

Article III courts may only hear "cases" and "controversies."  Const., Art.

III, § 2.  The requirement that every party have standing to assert claims grows out of this

mandate.  <u>Davis v. Federal Election Committee</u>, 554 U.S. 724, 733 (2008).  This

requirement also applies to Article I bankruptcy courts, as they are units of Article III

district courts.  <u>See</u>, <u>e.g.</u>, <u>In re Global Industrial Technologies, Inc.</u>, 645 F.3d 201, 210 (3d

Cir. 2011); <u>In re Weaver</u>, 632 F.2d at 462 n. 6; <u>see also</u> <u>Fred Reuping Leather Co. v. Fort</u>

<u>Greene National Bank of Brooklyn</u>, 102 F.2d 372 (3d Cir. 1939).  As the Third Circuit

instructed when addressing the issue of standing in bankruptcy cases, a party must

demonstrate:

> an "injury in fact" that is "concrete," "distinct and palpable,"
> and "actual or imminent."  <u>Whitmore v. Arkansas</u>, 495 U.S.
> 149, 155, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990).
> Additionally, the party must establish that the injury "fairly

can be traced to the challenged action and is likely to be redressed by a favorable decision." Id. (internal quotations omitted).

In re Global Industrial Technologies, Inc., 645 F.3d at 210; see generally Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

"[T]he standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." Davis v. Federal Election Committee, 554 U.S. at 734. It is undisputed that Mr. Carto is a creditor of the debtor holding a prepetition claim based upon an unpaid promissory note. See generally 11 U.S.C. § 101(10).

The failure of this plaintiff to file a proof of claim, as permitted by Federal Rule of Bankruptcy Procedure 3002(c)(3), results in his claim not being allowed under 11 U.S.C. § 502. See generally In re Toronto, 165 B.R. 746, 752 n.4 (Bankr. D. Conn. 1994). Nonetheless, disallowance of a claim owing solely to a creditor's failure to file a timely proof of claim does not negate the claim itself. It simply means that the creditor may be unable to receive a distribution from the chapter 7 trustee under 11 U.S.C. § 726. See generally, e.g., Hawxhurst v. Pettibone Corp., 40 F.3d 175, 179-80 (7th Cir. 1994); In re Grynberg, 986 F.2d 367, 370-71 (10th Cir. 1993). Thus, the trustee in this case does not propose in his final report to tender any distribution to the plaintiff.

Distinct, however, from the concept of allowance of a claim for distribution purposes is the effect of a chapter 7 discharge on the plaintiff's prepetition claim. If Ms. Oakley were granted a chapter 7 discharge, then Mr. Carto would be enjoined under 11 U.S.C. § 524(a) from any collection effort on his claim. See, e.g., Matter of Edgeworth, 993 F.2d 51, 53 (5th Cir. 1993) ("To ensure that a discharge will be completely effective,

16

it operates as an injunction against enforcement of a judgment or the commencement or

continuation of an action in other courts to collect or recover a debt as a personal liability

of the debtor. . . .  A discharge in bankruptcy does not extinguish the debt itself, but

merely releases the debtor from personal liability for the debt.") (citation omitted).  If,

however, the debtor's discharge were denied, then no statutory injunction under section

524(a) would arise, and this plaintiff would be free to exercise his state law rights to

recover his claim from non-exempt property.  See 11 U.S.C. § 522(c); cf. In re Ewiak, 75

B.R. 211 (Bankr. W.D. Pa. 1987) (a creditor whose judgment lien has been avoided under

section 522(f), but whose claim is nondischargeable, may seek to recover from non-

exempt property after the debtor's discharge is entered and the case is closed).

Accordingly, the entry of a discharge in favor of the debtor would adversely

affect the rights of Mr. Carto as a creditor of the debtor, and so he has standing to object

to the debtor's discharge and/or seek a determination of nondischargeability.  See, e.g., In

re Sullivan, 455 B.R. 829, 835-36 (B.A.P. 1st Cir. 2011):

> Section 727(c) provides the basis for standing to object to
> discharge.  Generally, the trustee, a creditor, or the United
> States Trustee may object to the debtor's discharge or the
> dischargeability of certain debts.  See 11 U.S.C. § 727(c)(1);
> see also Fed. R. Bankr. P. 4007(a).  Thus, whether Lussier has
> standing here turns on whether Lussier is a "creditor."  A
> creditor is any "entity that has a claim against the debtor that
> arose at the time of or before the order for relief concerning
> the debtor."  11 U.S.C. § 101(10).  A claim is a "right to
> payment, whether or not such a right is reduced to judgment,
> liquidated, unliquidated, fixed, contingent, matured,
> unmatured, disputed, undisputed, legal, equitable, secured, or
> unsecured."  11 U.S.C. § 101(5).
> ***
> Moreover, bankruptcy courts have recognized that claims
> need not be allowed in order to establish a party as a
> "creditor" under § 727(c)(1).  In the Eighth Circuit, the B.A.P.
> has held that where the debtor listed the Internal Revenue

17

Service (the "IRS") as a creditor, the IRS held a claim qualifying it as a creditor with standing to object to discharge under § 727, even if the claim was ultimately disputed, reduced, or disallowed.  Korte v. United States (In re Korte), 262 B.R. 464, 471 (8th Cir. BAP 2001).  Similarly a Michigan bankruptcy court, for two main reasons, rejected the debtor's argument that the chapter 7 trustee was not a creditor with standing to object to discharge.

> First, nothing in § 727(c) limits standing to object to the discharge to creditors whose claims are first allowed in the bankruptcy case. . . .  If Congress intended to limit standing to only those creditors with allowed claims, it could easily have crafted the statutory language to reflect that intent.  Thus, as demonstrated in the text, even a party with a disputed claim is a "creditor."  Second, when there are no assets available for distribution, as in most chapter 7 cases, even the filing of claims by creditors, let alone actually litigating such claims, is strongly discouraged.  See [Bankruptcy Rules] 2002(e) and 3002(c)(5).

Solomon v. Barman (In re Barman), 244 B.R. 896, 899 n. 3 (Bankr. E.D. Mich. 2000).

Therefore, based upon the applicable sections of the Bankruptcy Code, the undisputed facts, and the explicit language of In re Korte and In re Barman, the Panel recognizes Lussier as a creditor with standing to object to discharge under § 727(c)(1).

See also In re Hunn, 49 B.R. 430, 431 (Bankr. M.D. Fla. 1985):

> While Bankruptcy Rule 3002(a) clearly requires a proof of claim to be filed in order for the claim to be allowed for purposes of the claimant sharing in distribution in the estate, there is no suggestion in the statutes or the rules that a claim ceases to exist if not supported by a timely proof of claim. Title 11, U.S.C. § 101(9)(A) defines a creditor simply as an entity that has a claim against the debtor that arose at the time of or before the Order for Relief concerning the debtor.  There is no reference to schedules or proofs of claim.  There does not seem to be any equitable reason to bar this plaintiff from pursuing an action under § 727(a) on standing grounds.

IV.

A.

In his post-trial memorandum, the plaintiff contends that the debtor/defendant should be denied a chapter 7 discharge owing to her failure to disclose her two vehicle transfers, as well as her prepetition claim for counsel fees.  Plaintiff's Memorandum, at 18.

In general, an individual debtor will be granted a discharge in bankruptcy unless one of the specified exceptions found in section 727(a) applies.  In applying those exceptions, courts have recognized that denial of a debtor's discharge is a harsh sanction.  See In re Gioioso, 979 F.2d 956, 962 (3d Cir. 1992); In re Gudowitz, 1986 WL 28906, at *3 (Bankr. S.D.N.Y. July 8, 1986).  Accordingly, "[c]onsistent with the 'fresh start' policy underlying the Code, these exceptions to discharge should be construed strictly against the creditor and liberally in favor of the debtor."  Matter of Juzwiak, 89 F.3d 424, 427 (7th Cir. 1996); Rosen v. Bezner, 996 F.2d 1527, 1531 (3d Cir. 1993) ("Completely denying a debtor his discharge, as opposed to avoiding a transfer or declining to discharge an individual debt pursuant to § 523, is an extreme step and should not be taken lightly."); In re Adeeb, 787 F.2d 1339, 1342 (9th Cir. 1986).

Nevertheless, courts have also acknowledged that, "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor."  Matter of Juzwiak, 89 F.3d at 427; see, e.g., In re Luby, 438 B.R. 817, 826

19

(Bankr. E.D. Pa. 2010).  Thus, where a debtor has been dishonest in his dealings with the court or his creditors, it may be appropriate to deny her discharge, notwithstanding that an underlying goal of federal bankruptcy law is to provide a debtor with a fresh start. "While the law favors discharges in bankruptcy, it will not ordinarily tolerate the [debtor's] intentional departure from honest business practices where there is a reasonable likelihood of prejudice."  Kentile Floors, Inc. v. Winham, 440 F.2d 1128, 1131 (9th Cir. 1971); see In re Luby, 438 B.R. at 826.

In his memorandum, the plaintiff refers, inter alia, to 11 U.S.C. § 727(a)(4)(A), which  provides that a chapter 7 debtor will be denied a bankruptcy discharge when he or she "knowingly and fraudulently, in or in connection with the case– (A) made a false oath or account[.]"  The congressional purpose in enacting section 727(a)(4)(A) was to establish an "affirmative duty" for the chapter 7 debtor to completely disclose "all assets [and] liabilities and to answer all questions [pertaining to his/her financial affairs] fully and with the utmost candor."  In re Maletta, 159 B.R. 108, 112 (Bankr. D. Conn. 1993); see generally In re Phillips, 2012 WL 1071270 (11th Cir. 2012). As recognized by one court, "[t]he purpose of [section 727(a)(4)(A)] is to allow creditors to have adequate information of the [debtor's] estate without the need for an examination or investigation to determine if the statements are correct."  In re Hiegel, 117 B.R. 655, 659 (Bankr. D. Kan. 1990); see In re Gudowitz, 1986 WL 28906, at *4; see also In re Haverland, 150 B.R. 768, 772 (Bankr. S.D. Cal. 1993) ("A trustee or creditor should not be required to make a costly investigation . . . to uncover the existence of property which the debtor knowingly fails to disclose.").

20

In other words, section 727(a)(4)(A) seeks to insure that the chapter 7 debtor has made full, honest and accurate disclosure of her financial circumstances so the bankruptcy trustee and creditors have sufficient information for the proper administration of the chapter 7 case without having to incur the time and expense of an investigation into her affairs.  See In re Aubrey, 111 B.R. 268, 274 (B.A.P. 9th Cir. 1990) ("[T]he opportunity [for the debtor] to obtain a fresh start is thus conditioned upon truthful disclosure."); In re Burnley, 1999 WL 717215, at *3 (E.D. Pa. Aug. 27, 1999).  Especially given the large numbers of bankruptcy filings each year, the bankruptcy process depends upon the complete and candid disclosure of assets, income, expenses and liabilities of the debtor.  See generally Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414 (3d Cir. 1988) (failure to disclose a claim in a bankruptcy case may judicially estop the debtor from later asserting that claim in other forum).  Thus, it is understood that a debtor's subsequent amendments to her schedules may rectify an honest mistake, but cannot expunge any fraud in the falsity of an oath on the original schedules.  See In re Leech, 408 B.R. 222, 228 (Bankr. E.D. Wis. 2009); In re Kelly, 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992); In re Montgomery, 86 B.R. 948, 957 (Bankr. N.D. Ind. 1988); see also In re Wade, 189 B.R. 522, 526 n.1 (Bankr. M.D. Fla. 1995); see generally Payne v. Wood, 775 F.2d 202, 205 (7th Cir. 1985) ("The operation of the bankruptcy system depends on honest reporting.  If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive.  The omission of assets may be a good reason to deny or revoke a discharge.").

A creditor objecting to a debtor's discharge under section 727(a)(4)(A) has the burden of proof.  Fed. R. Bankr. P. 4005.  To meet that burden, the creditor must

prove by a preponderance standard, <u>see</u>, <u>e.g.</u>, <u>In re Phillips</u>, 476 Fed. Appx. 813 (11th Cir.

2012); <u>In re Georges</u>, 138 Fed. Appx. 471, 472 (3d Cir. 2005), that:

> (1) [the debtor] made a statement under oath; (2) the
> statement was false; (3) [the debtor] knew the statement was
> false; (4) [the debtor] made the statement with fraudulent
> intent; and (5) the statement related materially to the
> bankruptcy case.  False oaths sufficient to justify the denial of
> discharge include (1) a false statement or omission in the
> debtor's schedules or (2) a false statement by the debtor at the
> examination during the course of the proceedings.

<u>Matter of Beaubouef</u>, 966 F.2d 174, 178 (5th Cir. 1992) (citations and quotations

omitted); <u>see</u>, <u>e.g.</u>, <u>In re Pratt,</u> 411 F.3d 561, 566 (5th Cir. 2005); <u>Williamson v.

Fireman's Fund Insurance Co.</u>, 828 F.2d 249, 251 (4th Cir. 1987); <u>In re Strickland</u>, 350

B.R. 158, 163 (Bankr. D. Del. 2006).  A chapter 7 debtor's bankruptcy schedules and

statement of financial affairs are submitted under oath.  <u>See</u> Fed. R. Bankr. P. 1008.

Accordingly, a material "false statement made in a bankruptcy petition, schedule or

statement of financial affairs constitutes a false oath within the meaning of [s]ection

727(a)(4)(A)." <u>In re Senese</u>, 245 B.R. 565, 574 (Bankr. N.D. Ill. 2000); <u>see</u> <u>In re

Strickland</u>, 350 B.R. at 163 (citing Fed. R. Bankr. P. 1008 and  28 U.S.C. § 1746).

While an omission or false statement caused by an honest mistake or

oversight will not be sufficient to deny the chapter 7 debtor his discharge, <u>see</u> <u>In re

Georges</u>, 138 Fed. Appx. at 472, an omission or misstatement made with a "reckless

indifference to the truth" will fall within the scope of § 727(a)(4)(A) if the subject matter

is material to the administration of the bankruptcy case.  <u>In re Tully</u>, 818 F.2d 106, 112

(1st Cir.1987) ("'reckless indifference to the truth' . . . which has consistently been

treated as the functional equivalent of fraud for the purposes of § 727(a)(4)(A)."); <u>see</u>,

<u>e.g.</u>, <u>Daniels v. Agin</u>, 736 F.3d 70, 86 (1st Cir. 2013); <u>In re Bren</u>, 122 Fed. Appx. 285,

286 (8th Cir. 2005); Matter of Beaubouef, 966 F.2d at 178; Cadle Co. v. Zofko, 380 B.R. 375, 382 (W.D. Pa. 2007); In re Liberatore, 2013 WL 5429875, at *11 n.1 (Bankr. E.D. Pa. Sept. 30, 2013); In re Von Kiel, 461 B.R. 323, 341 (Bankr. E.D. Pa. 2012); see In re Mitchell, 102 Fed. Appx. 860 (5th Cir. 2004) (reckless indifference to truth supports denial of discharge under section 727(a)(4)); see also In re Chavin, 150 F.3d 726, 728 (7th Cir. 1998) ("[N]ot caring whether some representation is true or false—the state of mind known as 'reckless disregard'—is, at least for purposes of the provisions of the Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material.").

Furthermore, "[t]he subject matter of a false oath is material, and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." In re Chalik, 748 F.2d 616, 618 (11th Cir. 1984) (internal quotations omitted); see, e.g., Stamat v. Neary, 635 F.3d 974, 982 (7th Cir. 2011); In re Phillips, 476 Fed. Appx. 813; In re Sholdra, 249 F.3d 380, 383 (5th Cir. 2001) ("As we have noted, '[f]ull disclosure of assets and liabilities in the schedules required to be filed by one seeking relief under Chapter 7 is essential.'") (quoting Matter of Beaubouef, 966 F.2d at 179). The ultimate value of the undisclosed asset(s) to the bankruptcy estate is not a valid defense to a willful or reckless failure to disclose its existence. See, e.g., Stamat v. Neary, 635 F.3d at 982-83.

In determining when a false statement is made knowingly, courts have observed that the debtor's background and education may be relevant:

A statement is considered to have been made with knowledge of its falsity if it was known by the debtor to be false, made

23

> without belief in its truth, or made with reckless disregard for
> the truth.  Where persuasive evidence of a false statement
> under oath has been produced by a plaintiff, the burden shifts
> to the defendant to prove that it was not intentionally false . . .
>
> Courts may consider the debtor's education, business
> experience, and reliance on counsel when evaluating the
> debtor's knowledge of a false statement, but the debtor is not
> exonerated by pleading that he or she relied on patently
> improper advice of counsel.  Furthermore, a debtor cannot,
> merely by playing ostrich and burying his head deeply enough
> in the sand, disclaim all responsibility for statements which he
> has made under oath.

In re Maletta, 159 B.R. at 112 (internal quotations and citations omitted); see, e.g., Stamat

v. Neary, 635 F.3d 974, 982 (7th Cir. 2011) ("Given the Stamats' level of education and

business experience, their failure to disclose the required past business interests, property

transfers, and income as discussed above shows a reckless disregard sufficient for the

bankruptcy court's finding of intent under section 727(a)(4), and we do not disturb that

finding.") (citing cases).

As noted above, a debtor's liability under section 727(a)(4) requires that the

false oath be made with fraudulent intent and not inadvertently.  As with § 727(a)(2)(A),

fraudulent intent may be inferred:

> The problems inherent in ascertaining whether a debtor has
> acted with fraudulent intent are obvious.  Ordinarily, the
> debtor will be the only person able to testify directly
> concerning his intent.  Because a debtor is unlikely to testify
> directly that his intent was fraudulent, the courts may deduce
> fraudulent intent from all the facts and circumstances of a
> case.

In re Williamson, 828 F.2d at 252 (internal citations omitted); Chusid v. First Union

National Bank, 1998 WL 42292, at *7 (E.D. Pa. Jan. 21, 1998); In re Singh, 433 B.R.

139, 159 (Bankr. E.D. Pa. 2010) ("Because debtors will rarely to [sic] admit to fraudulent

24

intent, the requisite intent necessary for the denial of discharge under § 727(a)(4)(A) may be inferred from circumstantial evidence, such as a pattern of nondisclosure and concealment."); In re Senese, 245 B.R. at 575 ("Direct evidence of fraudulent intent is not required; rather, it is sufficient to prove by circumstantial evidence either a pattern of concealment and errors or other conduct that suggests reckless indifference to the truth.").

Thus, reckless indifference to the truth can be inferred from numerous errors and omissions in the bankruptcy schedules or statement of financial affairs. See, e.g., In re Miller, 39 F.3d 301, 305 (11th Cir. 1994) ("A bankruptcy court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive."); In re Corona, 2010 WL 1382122, at *9 (D.N.J. Apr. 5, 2010); In re Kiel, 461 B.R. 323, 341 (Bankr. E.D. Pa. 2012). Moreover, a court may take into account the demeanor of the debtor, when the latter is testifying at trial, in assessing whether those errors and omissions stemmed from "reckless indifference" or were inadvertent, honest mistakes. See In re Singh, 433 B.R. at 159.

## B.

As noted by the plaintiff, the debtor did not disclose, until after this adversary proceeding commenced, that she had sold two BMW automobiles within two years of her bankruptcy filing. The result of those transfers was, essentially, that the debtor spent (or plaintiff believes dissipated) $52,000 in the span of approximately nine months: a fact that a bankruptcy trustee would deem worthy of investigation. See In re

Mascolo, 505 F.2d 274, 278 (1st Cir. 1974) ("'It cannot be doubted that the creditors are

entitled to inquire into what property has passed through the bankrupt's hands during a

period prior to his bankruptcy . . . we think that wide latitude must be accorded to such an

examination, and that the materiality of the false oath will not depend upon whether in

fact the falsehood has been detrimental to the creditors.'") (quoting In re Slocum, 22 F.2d

282, 285 (2d Cir. 1927)).

The Statement of Financial Affairs #10, Official Bankruptcy Form 7,

requires that all debtors: "List all other property, other than property transferred in the

ordinary course of the business or financial affairs of the debtor, transferred either

absolutely or as security within two years immediately preceding the commencement of

this case."  The debtor's explanation for her non-disclosure—that she believed she need

only disclose transfers made to family or friends—is difficult to accept, given the

relatively straightforward language of the question and the fact that she is an attorney.

Moreover, to the extent that the debtor claims that she relied upon her

bankruptcy attorney for her non-answer (and that attorney was not called to testify), such

reliance is also questionable for the same reasons:

> More importantly, relying on the advice of one's
> fully-informed attorney in reporting assets may negate an
> inference of fraud or intentional concealment, but only if it is
> not "transparently plain that the property [in question] should
> be scheduled."

Daniels v. Agin, 736 F.3d 70, 85 (1st Cir. 2013) (quoting In re Mascolo, 505 F.2d 274,

277 n. 4 (1st Cir.1974)).

No explanation was offered for the debtor's failure to initially disclose her claim to substantial counsel fees when she filed her original Bankruptcy Schedule B on November 9, 2012.

Bankruptcy Schedule B, part of Official Bankruptcy Form 6, requests that debtors disclose all prepetition personal property by category.  Question #16 seeks information about all outstanding accounts receivables.  The debtor testified that she was aware as early as November 2011 that she was entitled to attorney fees.  The district court decision in McKenna v. City of Philadelphia, 2012 WL 5269218, at *3 (E.D. Pa. October 25, 2012) makes clear that Ms. Oakley was seeking a court award of fees in that case no later than May 2012.  As Ms. Oakley noted that the failure to receive substantial attorney's fees was a significant factor in her financial circumstances, it thus was unlikely to have been forgotten by her when she filed her original bankruptcy schedules. Moreover, she received the McKenna fee award from the district court in October 2012. Yet, on November 9, 2012, about one month later, the debtor failed to disclose that fee on her Bankruptcy Schedule B.  Furthermore, she never disclosed her claim for outstanding fees in any other litigation she had worked on, although she opined that she fees could be significant.

These two omissions concerning assets and prepetition transfers were material to the fair and prompt administration of the debtor's chapter 7 bankruptcy case. The omissions, coupled with the debtor's failure to disclose an address to which court notices should be sent that she would receive, omission of a business address or other information about her prepetition self-employment, her confusing disclosure on Bankruptcy Schedule A as to the value of her interest in the Weatham Street realty (was it

27

$80,000 or $25,000?) and her lack of knowledge of the judgment obtained by Mr. Ruga

against her (her testimony, that she relied upon an attorney to keep her informed, the same

attorney whom, no later than November 2011, she no longer trusted, is problematic)

demonstrate by a preponderance of the evidence that the debtor signed her original

bankruptcy schedules and statement of financial affairs with a reckless regard for

accuracy.

Ms. Oakley is not a debtor of limited education who must rely upon

bankruptcy counsel to complete these requisite disclosure forms.  She is an educated

attorney who practiced civil law, who knew or should have known that her factual

disclosures were made under oath and that reasonable care was required of her to insure

that full and accurate information about her assets and prepetition transfers was provided.

See In re Johnson, 82 B.R. 801, 806 (Bankr. E.D.N.C. 1988) ("It has been held that it is

no defense to an objection to discharge that one relied on the advice of counsel when the

questions which were falsely answered did not require professional assistance in order to

be answered truthfully.").

Moreover, her various amended schedules and statement of financial

affairs, some of which were in response to this adversary proceeding, do not mitigate her

recklessness in completing the original schedules and statement.  See, e.g., In re Sholdra,

249 F.3d 380, 382 (5th Cir.2001); Payne v. Wood; In re Leech, 408 B.R. at 228

Accordingly, given the evidence presented, I conclude that the debtor must be denied her

bankruptcy discharge under section 727(a)(4).  See, e.g., In re Phillips, 476 Fed. Appx.

813, 817 (11th Cir. 2012) (failure to disclose sale of property warranted denial of

discharge); Stamat v. Neary, 635 F.3d 974, 982 (7th Cir. 2011) (failure to disclose assets

and transfers was reckless for purposes of section 727(a)(4)); In re Mitchell, 102 Fed.

Appx. 860, 862-63 (5th Cir. 2004) (numerous errors and omissions in the bankruptcy

schedules caused by the debtors' failure to carefully review them before signing consisted

false oaths under section 727(a)(4)).


V.


Having thus concluded that the evidence supports a denial of discharge

under section 727(a)(4), I need not address the plaintiff's contention that his debt is

nondischargeable by virtue of section 523(a)(2), as the plaintiff can obtain no additional

relief.  See, e.g., In re Adler, 494 B.R. 43, 56 (Bankr. E.D.N.Y.  2013) ("If a debtor's

discharge is denied in its entirety, all reasons to except a particular obligation from

discharge under § 523(a), are rendered moot."); In re Burrik, 459 B.R. 881, 887 (Bankr.

W.D. Pa. 2011); In re Bennitt, 2010 WL 4622451, at *9 (Bankr. N.D. Ala. Nov. 4, 2010).

Nonetheless, in the interest of completeness, because the bulk of the evidence presented

by the parties concerns the plaintiff's allegation that the debtor acted fraudulently

prepetition, and to aid in any appellate review, I shall also determine plaintiff's alternative

claim.  See In re Hannan, 477 B.R. 603, 612 (Bankr. W.D. Pa. 2012) (addressing

nondischargeability under 523(a) even though upholding the plaintiff's objection to

discharge); cf. Edwards v. Wyatt, 335 F.3d 261, 277 (3d Cir. 2003) (holding that a failure

to consider an alternative claim necessitated a remand to the trial court where the ruling

on the primary claim was erroneous).

A.

As just noted, Mr. Carto also seeks relief under 11 U.S.C. § 523(a)(2)(A)

and (B).[10]

Section 523(a)(2) states that "[a] discharge under section 727 . . . does not

discharge an individual debtor from any debt–

> (2) for money, property, services, or an extension, renewal or
> refinancing of credit, to the extent obtained, by–

---

[10]Mr. Carto also argued in his post-trial memorandum that Ms. Oakley's engaging in a transaction with him represented a violation of the Pennsylvania Rule of Professional Conduct 1.8(a).  He argues that "[s]aid representation created an attorney client relationship and said relationship creates a higher standard by which the Defendant should be judged in the present case."  To the extent that the plaintiff is implicitly raising a nondischargeability claim under section 523(a)(4), the evidence presented does not support such a claim.

Section 523(a)(4) provides that a debt is nondischargeable "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."  The plaintiff does not contend that Ms. Oakley committed larceny or embezzlement.  And although the debtor's representation of the plaintiff's funeral home in a collection action prior to March 2011 may have rendered her a fiduciary at that time, see Maritrans GP Inc. v. Pepper, Hamilton & Scheetz, 529 Pa. 241, 253 (Pa. 1992), section 523(a)(4) requires that "the debt was attributable to fraud or defalcation committed by [the debtor] in the course of that fiduciary relationship."  In re Siegfried, 5 Fed. Appx. 856, 859 (10th Cir. 2001); In re Young, 91 F.3d 1367, 1371 (10th Cir. 1996); In re Hampton, 407 B.R. 443 (table), 2009 WL 612491, at *2 (B.A.P. 10th Cir. 2009) (noting that "the bankruptcy court found creditors had failed to establish that Debtor owed a fiduciary duty to them and, even assuming such a duty existed, failed to prove that the debt in question arose as a result of fraud or defalcation.").

Here, there is no dispute that the plaintiff's claim did not arise out of a collection action for which she was retained, but out of a completely separate March 2011 loan transaction, for which the plaintiff and defendant acted as creditor and debtor and not as attorney and client.  Moreover, there was no evidence of defalcation, defined as situations where a fiduciary misappropriates or otherwise fails to account for money or property held in her fiduciary capacity.  See, e.g., In re Briles, 2001 WL 873829, at *1 (9th Cir. 2001); In re Grigg, 2013 WL 5771870, at *4 (Bankr. W.D. Pa. Oct. 23, 2013) ("Nondischargeability based on the fiduciary relationship is usually reserved for situations in which an attorney/debtor has been entrusted with funds or property."); 5 Collier on Bankruptcy, ¶ 523.10[1][b] (16th ed. 2012) ("'Defalcation' refers to a failure to produce funds entrusted to a fiduciary. . . .").  Furthermore, as will be discussed in connection with section 523(a)(2), the plaintiff did not establish all the elements of fraud.

30

(A) false pretenses, a false representation, or
actual fraud, other than a statement respecting
the debtor's or an insider's financial condition;
[or]

(B) use of a statement in writing–

(i) that is materially false;
(ii) respecting the debtor's or an
insider's financial condition;
(iii) on which the creditor to
whom the debtor is liable for such
money, property, services, or
credit reasonably relied; and
(iv) that the debtor caused to be
made or published with intent to
deceive[.]

See generally Field v. Mans, 516 U.S. 59 (1995); In re Brady, 243 B.R. 253, 258 (E.D.

Pa. 2000); In re Lee, 2000 WL 815928, at *2 (Bankr. E.D. Pa. June 21, 2000).

The plaintiff contends that his claim against the debtor is nondischargeable

under section 523(a)(2)(B) "because the promissory note contains materially false

statements about [the debtor's] financial condition upon which Nunzio Carto, Jr.

reasonably relied, and the facts show that Debtor made these statements in order to

deceive Nunzio Carto, Jr. and induce him to loan the Defendant $65,000.00."  Debtor's

Posttrial Memorandum, at 13 (unpaginated).

A creditor must prove the following to establish nondischargeable relief

under subsection 523(a)(2)(B):

Subsection (2)(B) . . . was designed to bar the bankruptcy
discharge of a debt obligation that was induced by a false
written statement of the debtor's financial condition. . . .  In
order to satisfy subsection (2)(B), a creditor must prove five
elements: (1) "use of a statement in writing," (2) "that [was]
materially false," (3) "respecting the debtor's . . . financial
condition," (4) "on which the creditor . . . reasonably relied,"

31

and (5) "that the debtor caused to be made or published with intent to deceive." § 523(a)(2)(B).

In re Sharp, 340 Fed. Appx. 899, 901 (4th Cir. 2009); see also In re Cohn, 54 F.3d 1108,

1114 (3d Cir. 1995):

> The burden of proving that a debt is nondischargeable under § 523(a) is upon the creditor, who must establish entitlement to an exception by a preponderance of the evidence. . . .  Thus, pursuant to § 523(a)(2)(B), INA must prove that Cohn used a statement in writing: (1) that is materially false; (2) respecting his financial condition; (3) upon which INA reasonably relied; and (4) with the intent to deceive INA.

> "Section 523(a)(2)(B) does not cover every material statement of fact made

in writing to the creditor to induce the credit.  It is confined in its application to

statements about the financial condition of the debtor[.]"  In re Bashor, 2011 WL

4595508, at *5-*6 (W.D.N.C. Sept. 29, 2011) (citing 4 Collier on Bankruptcy §

523.08[2][c]).  "To satisfy section 523(a)(2)(B), the statement must do more than just

prompt speculation about the debtor's finances. It must be 'sufficient to determine

financial responsibility.' . . .  Transactional documents that merely imply a certain

financial status, on the other hand, will not."  In re Brzakala, 305 B.R. 705, 709 (Bankr.

N.D. Ill. 2004) (quoting In re Price, 123 B.R. 42, 45 (Bankr. N.D. Ill. 1991); see also

Czech v. Sieber, 2009 WL 4017971 (D. Md. Nov. 18, 2009) (home improvement contract

was not a statement of financial condition).

> The only writing that Mr. Carto refers to is the promissory note signed by

Ms. Oakley on March 3, 2011.  A promissory note, which contains terms and conditions

regarding repayment, is not a statement respecting the payee's financial condition.  See,

e.g., In re Zarkhin, 2013 WL 5591937, at 7 (Bankr. N.D. Ill. Oct. 10 ,2013); In re Foster,

2010 WL 2025784, at *3 (Bankr. N.D. Ga. Feb. 26, 2010 ("The promissory note does not

contain any information in writing about debtor's financial condition which is a key element of a § 523(a)(2)(B) claim); In re Soderlund, 197 B.R. 742 (Bankr. D. Mass. 1996) (execution of a promissory note alone is not within the scope of section 523(a)(2)(B)); In re Segal, 195 B.R. 325, 331-32 (Bankr. E.D. Pa. 1996) (execution of a lease and promissory note did not constitute financial statements under section 523(a)(2)(B)).

Furthermore, as will be more fully discussed below, there was no evidence that Mr. Carto actually relied upon the terms of the promissory note in agreeing to lend the funds to Ms. Oakley.  See In re Cohn, 54 F.3d at 1115; In re Coughlin, 27 B.R. 632, 636-37 (B.A.P. 1st Cir. 1983):

> Courts generally agree that the creditor must show that it considered and relied on the actual financial statement in question. . . .  Courts have found that the reliance element of section 523(a)(2)(B) was missing when the evidence indicated that the creditor was relying solely on a previous loan repayment, . . .  the debtor's established credit rating, . . .  or on the pledged security, . . . or when the false financial information was submitted after the goods or services were provided. . . .

(citations omitted); see also Green Bay Packaging, Inc. v. Oscarson, 2007 WL 3407108, at *4 (N.D. Ill. 2007);  Miles Employee Federal Credit Union v. Griffin, 22 B.R. 821, 824-25 (Bankr. S.D. Ohio 1982).

Therefore, the plaintiff did not establish that his debt is nondischargeable under section 523(a)(2)(B).

B.

Finally, and most strongly, the plaintiff contends that his claim against Ms.

Oakley is nondischargeable under section 523(a)(2)(A).  He argues that the debtor offered

the Weatham Street realty to the plaintiff without disclosing the malpractice lawsuits filed

against her.  He further maintains that she misrepresented her intention regarding a

quitclaim deed of the realty and a security interest in the BMW automobile upon which

the plaintiff justifiably relied.  Plaintiff's Memorandum at 12 (unpaginated).

Thus, the plaintiff asserts that his claim against Ms. Oakley arose through

fraud within the meaning of section 523(a)(2)(A), quoted above.  In parsing the language

of section 523(a)(2)(A), courts have drawn a distinction among a "false representation,"

"false pretenses," and "actual fraud."

> The "false representation" ground requires a showing that the
> debtor made a "false or misleading statement about
> something."  [In re Barnaby, 2007 WL 750332,] at *2
> [(Bankr. D.N.J. 2007)].  The second option, "false pretenses,"
> requires proof of an implied misrepresentation promoted
> knowingly and willingly that creates a misleading
> understanding of the transaction by the plaintiff.  Id. at *2
> (citation omitted).  See [In re Ali, 321 B.R. 685,] at 690
> [(Bankr. W.D. Pa. 2005)] (false pretense involves an implied
> misrepresentation, as distinguished from an express
> misrepresentation, that creates or fosters a false impression).

In re Giquinto, 388 B.R. 152, 165 n.26 (Bankr. E.D. Pa. 2008); see, e.g., In re Brandon,

297 B.R. 308, 313 (Bankr. S.D. Ga. 2002); Matter of Haining, 119 B.R. 460, 463-64

(Bankr. D. Del. 1990); In re Weinstein, 31 B.R. 804, 809 (Bankr. E.D.N.Y. 1983).

As observed by another bankruptcy court:

> "False pretense do[es] not necessarily require overt
> misrepresentations.  Instead, omissions or a failure to disclose

34

> on the part of the debtor can constitute misrepresentations for purposes of nondischargeability where circumstances of the case are such that omissions or failure to disclose create a false impression which is known by the debtor." Peterson v. Bozzano (In re Bozzano), 173 B.R. 990, 993 (Bankr. M.D.N.C. 1994). . . .  Failure to disclose material facts on which a transaction depends constitutes false pretenses within the statute.

In re Soliz, 201 B.R. 363, 369 (Bankr. S.D.N.Y. 1996).

In order for a plaintiff to prevail under the false representation provision of

section 523(a)(2)(A) it must demonstrate that:

> (1) the debtor made representations knowing they were false; (2) the debtor made the representations with the intent and purpose of deceiving the plaintiff; (3) the creditor justifiably relied on the debtor's false representations; and (4) the creditor suffered a loss or damage as a proximate consequence of the representations having been made.

In re Adalian, 474 B.R. 150, 160 (Bankr. M.D. Pa. 2012); see, e.g., Field v. Mans, 516

U.S. 59, 61 (1995); In re Ophaug, 827 F.2d 340, 342 n. 1 (8th Cir. 1987).

The elements of establishing a nondischargeable claim for false pretenses

are similar:

> In order to establish that a debt is nondischargeable under § 523(a)(2)(A) as a debt for money, property, services, or credit obtained by false pretenses, a plaintiff must prove by a preponderance of the evidence that: "(1) the [defendant] made an omission or implied misrepresentation; (2) promoted knowingly and willingly by the defendant[ ]; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff [ ]; (4) which wrongfully induced the plaintiff[ ] to advance money, property, or credit to the defendant."

In re Khafaga, 419 B.R. 539, 546 (Bankr. E.D.N.Y. 2009) (quoting In re Hambley, 329

B.R. 382, 396 (Bankr. E.D.N.Y. 2005)),

And as concerns actual fraud:

"Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1293 (5th Cir. 1995) (quoting 3 Collier on Bankruptcy ¶ 523.08[5], at 523-57 to 523-58 (footnote omitted)). "The concept of actual or positive fraud consists of something said, done, or omitted by a person with the design of perpetrating what he knows to be a cheat or deception." In re Stentz, 197 B.R. 966, 981 (Bankr. D. Neb. 1996).

In re Moen, 238 B.R. 785, 790-91 (B.A.P. 8th Cir. 1999); see, e.g., In re Altieri, 2012 WL 3595298, at *2 (Bankr. D.N.J. Aug. 20, 2012); In re Miller, 282 B.R. 569, 575 (Bankr. D. Conn. 2002).

In order to prevail under section 523(a)(2)(A), whether based upon actual fraud, false pretenses, or false representation, a showing of fraudulent intent to deceive is required. See, e.g., In re Davis, 638 F.3d 549, 552 (7th Cir. 2011); In re Sharp, 340 Fed. Appx. 899, 901 (4th Cir. 2009); Palmacci v. Umpierrez, 121 F.3d 781, 788 (1st Cir. 1997). Moreover, when evaluating whether a debtor fraudulently deceived a creditor by his misrepresentations or false pretenses, a court must look at the debtor's intention, Field v. Mans, 516 U.S. at 59, at the time the misrepresentation, either express or implied, was made. See, e.g., In re Sherman, 658 F.3d 1009, 1014 (9th Cir. 2011); Matter of Jadusingh, 2001 WL 360701, at *2 (E.D. Pa. 2001); In re Brady 243 B.R. 253, 259 (E.D. Pa. 2000). Such intent may be established by circumstantial evidence. See, e.g., In re Adalian, 474 B.R. at 160; In re Giquinto, 388 B.R. at 166.

In other words, to warrant relief under section 523(a)(2)(A), the plaintiff must prove the debtor's fraudulent intent at the time the debt arose. See Palmacci v. Umpierrez, 121 F.3d at 787 ("If, at the time he made his promise, the debtor did not

36

intend to perform, then he has made a false representation (false as to his intent) and the

debt that arose as a result thereof is not dischargeable (if the other elements of §

523(a)(2)(A) are met).  If he did so intend at the time he made his promise, but

subsequently decided that he could not or would not so perform, then his initial

representation was not false when made."); <u>see</u> <u>also</u> <u>In re Dobek</u>, 278 B.R. 496, 508

(Bankr. N.D. Ill. 2002) ("For purposes of Section 523(a)(2), however, the timing of the

fraud and the elements to prove fraud focus on the time when the lender . . . made the

extension of credit to the Debtor.").

       Thus, a creditor's demonstration that a debtor committed a breach of a

contract, by itself, does not render the contract claim nondischargeable:

> It is well established that "a broken promise to repay a debt,
> without more, will not sustain a cause of action under §
> 523(a)(2)(A)."  <u>In re Harrison</u>, 301 B.R. 849, 854 (Bankr.
> N.D. Ohio, 2003).  Were it otherwise, every breach of
> contract would give rise to a nondischargeability claim under
> § 523(a)(2)(A).

<u>In re Singh</u>, 433 B.R. 139, 163 (Bankr. E.D. Pa. 2010); <u>see</u>, <u>e.g.</u>, <u>In re Ricker</u>, 2012 WL

2951383, at *9 (Bankr. E.D. Pa. 2012).  "Instead, central to the concept of fraud is the

existence of scienter which, for purposes of § 523(a)(2)(A), requires that it be shown that

at the time the debt was incurred, there existed no intent on the part of the debtor to repay

the obligation."  <u>In re Harrison</u>, 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003).

       In addition, whether asserting that actual fraud, a false representation or

false pretenses were made and warrant relief under section 523(a)(2)(A), a showing of

justifiable reliance and causation of loss must be made.  <u>See</u>, <u>e.g.</u>, <u>In re August</u>, 448 B.R.

331, 350 (Bankr. E.D. Pa. 2011); <u>In re Ali</u>, 321 B.R. 685, 690 (Bankr. W.D. Pa. 2005).

Justifiable reliance is a lower standard than reasonable reliance, but nonetheless requires

that the creditor prove that it actually relied upon the alleged misresprension or false

pretenses.  See Owens v. Owens, 155 Fed. Appx. 42, 44-45 (2d Cir. 2005); In re Spigel,

260 F.3d 27, 32 (1st Cir. 2001):

> [i]n order to establish that a debt is nondischargeable because
> obtained by "false pretenses, a false representation, or actual
> fraud," we have held that a creditor must show that . . . 4) the
> creditor actually relied upon the misrepresentation, 5) the
> creditor's reliance was justifiable.

The creditor need not prove, however, that such actual reliance was

reasonable, only justifiable.  As observed by the Seventh Circuit Court of Appeals:

> Justifiable reliance is a less demanding standard than
> reasonable reliance; it requires only that the creditor did not
> "blindly [rely] upon a misrepresentation the falsity of which
> would be patent to him if he had utilized his opportunity to
> make a cursory examination or investigation." Field, 516
> U.S. at 71, 116 S. Ct. 437 (internal quotation marks omitted).
> Under the justifiable reliance standard, a creditor has no duty
> to investigate unless the falsity of the representation would
> have been readily apparent. Id. at 70-71, 116 S. Ct. 437.  But
> the justifiable reliance standard is not an objective one.
> Rather, it is determined by looking at the circumstances of a
> particular case and the characteristics of a particular plaintiff.

Ojeda v. Goldberg, 599 F.3d 712, 717 (7th Cir. 2010).

Moreover, when seeking a determination under section 523(a)(2), the

plaintiff/creditor bears the burden of proving all the elements of nondischargeability by a

preponderance of the evidence.  See, e.g., In re Graham, 973 F.2d 1089, 1101 (3d Cir.

1992) (citing Grogan v. Garner, 498 U.S. 279, 288 (1991)).

In this proceeding, the plaintiff failed to demonstrate justifiable reliance

upon any statements or omissions made by the debtor because the evidence demonstrated

that he did not actually rely upon any statements or omissions.

38

First, the evidence was clear that when Ms. Oakley first approached Mr. Carto about purchasing her one-third interest in the Weatham Street realty, he was not interested in her offer.  Indeed, he also testified that he had no knowledge of her ownership of that property.  See N.T. at 143-44.  Therefore, even if I assume that in any discussion about that property the debtor had a duty to disclose pending lawsuits against her that could have, or did, give rise to judgment liens, any failure to disclose is immaterial, as the transaction proposed by the debtor never took place.

Second, when Mr. Carto agreed to enter into a loan agreement with Ms. Oakley, he did so out of his wife's friendship with Ms. Oakley, and based solely upon her promise to repay him within one year.  He requested no other terms in the promissory note; nor did he review the note before tendering payment to Ms. Oakley.  N.T. at 143, 150.  In fact, he tendered the first of the two loan checks before Ms. Oakley even gave him a copy of the promissory note.  In other words, whatever provisions were included in the promissory note, the only representation that Mr. Carto relied upon was the debtor's oral promise to repay within one year.  N.T. at 143.

It is clear that Ms. Oakley did not comply with the various terms of the promissory note she drafted.  However, the plaintiff presented no evidence that in March 2011, she had no intention of repaying Mr. Carto.  The evidence reflects that after March 2011, the debtor made some effort to have the Weatham property sold so her interest in it would be liquidated.  If she did not intend to repay Mr. Carto in March 2011, she would not have done so.

Accordingly, although Mr. Carto proved that the debtor breached various provisions of her promissory note, he did not meet his burden of proof that she acted

fraudulently in March 2011 when she promised to repay him within one year, or that he

actually relied upon any of her other representations and omissions.  Thus, he is not

entitled to relief under section 523(a)(2)(A).

        An appropriate order will be entered.


_____
BRUCE FOX
United States Bankruptcy Judge

Dated: December 30, 2013